UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

ROBERT HARPER,                    )
                                  )
          Plaintiff,              )
                                  )
     v.                           )          No. 2:15 CV 87 CDP
                                  )
NANCY A. BERRYHILL,               )
Acting Commissioner of Social Security,[1]  )
                                  )
          Defendant.              )

**MEMORANDUM AND ORDER**

Plaintiff Robert Harper brings this action under 42 U.S.C. § 405 seeking

judicial review of the Commissioner's final decision denying his claim for

disability insurance benefits (DIB) under Title II of the Social Security Act, 42

U.S.C. §§ 401, *et seq.* Because the Commissioner's final decision is supported by

substantial evidence on the record as a whole, I will affirm the decision.

## I.  Procedural History

On July 26, 2012, the Social Security Administration denied Harper's

January 2012 application for DIB, in which he claimed he became disabled on

March 1, 2011, because of blocked arteries, back pain, high cholesterol, and

---

[1] On January 20, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security. Under Fed. R. Civ. P. 25(d), Berryhill is automatically substituted for former Acting Commissioner Carolyn W. Colvin as defendant in this action. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

possible cancer. He later amended his alleged onset date to December 19, 2011. At Harper's request, a hearing was held before an administrative law judge (ALJ) on March 31, 2014, at which Harper testified. Vocational and medical experts later answered interrogatories put to them by the ALJ. On August 26, 2014, the ALJ denied Harper's claim for benefits, finding that Harper could perform work as it exists in significant numbers in the national economy. On October 7, 2015, the Appeals Council denied Harper's request for review of the ALJ's decision. The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

In this action for judicial review, Harper claims that the ALJ's decision is not supported by substantial evidence on the record as a whole, arguing specifically that the ALJ improperly found his subjective complaints not to be credible and failed to include all of his limitations in the hypothetical question posed to the vocational expert. Harper requests that the matter be reversed and remanded for further evaluation.

For the reasons that follow, the ALJ did not err in his decision.

## II.  Evidence Before the ALJ

A.    Harper's Testimony

At the hearing on March 31, 2014, Harper testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, Harper was forty-five years of age. He lives

alone in a small house with a pet.  He completed the eighth grade and never obtained his GED.  (Tr. 33-34.)

Harper's Work History Report shows that Harper worked from 1992 to 1998 at A/U Max and in 2001 at Fabcon.  He worked with plumbing companies from May 2003 to September 2009 and stopped working in November 2009 because he was laid off.  (Tr. 141, 163.)  Harper testified that he cannot currently work because of problems with his legs and hips and because of the inconsistent nature of his good and bad days.  (Tr. 36.)

Harper testified that he went to the hospital in December 2011 with suspected appendicitis but learned that he had clogged arteries.  He was placed on medication, given restrictions, and was told that he needed surgery.  (Tr. 34-35.)

Harper testified that he experiences pain in his legs and hips every day.  The pain worsens with hills, stairs, extensive walking, excessive sitting, and standing. He uses a heating pad for pain two or three times a week for up to an hour and a half each time.  Sometimes the pain is so severe that he must sit on the couch for two days with a heating pad.  He takes no pain medication.  (Tr. 36-37, 39.)

Harper testified that he experiences no symptoms of depression or anxiety and gets along with people, depending "[o]n the person."  (Tr. 40-41.)

Harper testified that his exertional abilities change from day to day, but he can usually stand for about one hour before needing to sit.  He can walk on a flat

surface for about twenty minutes.  He can sit for half an hour to an hour but is generally limited because of medication side effects, including bleeding and hemorrhoids.  (Tr. 37-39.)

As to his daily activities, Harper testified that he is able to go grocery shopping and drives to and from the grocery store, which is about a twenty-minute drive each way.  After unloading groceries, he is on the couch for about an hour and a half.  Harper does all of his household chores "for the most part," but not regularly.  His cousin mows his lawn.  He watches television during the day and occasionally visits a friend or relative.  Harper testified that he leaves the house twice a week to go grocery shopping or visit with family.  (Tr. 40-42.)

B.    Medical Treatment Records

From June to September 2010, Harper received treatment in the form of physical therapy, steroid injection, and medication management for low back pain radiating down the right leg, with associated numbness in the foot.  (Tr. 238-40, 336-45.)  In May 2011, he visited his treating physician, Dr. George P. Stachecki for an insect bite.  He had no other complaints.  (Tr. 332-35.)

On December 19, 2011, Harper was admitted to the emergency room at SSM St. Joseph Hospital West with complaints of abdominal pain and vomiting. He denied shortness of breath or chest pain.  He showed no signs of depression, and his affect and judgment were normal.  Physical examination showed

tenderness and pain about the lumbar back, but he had full range of motion. It was noted that Harper took no prescription medication. A CT scan showed moderate atherosclerosis with extensive thrombus formation involving the abdominal aorta. Moderately large perfusion defects were noted about the spleen and right kidney, and a small cyst was noted in the dome of the liver. Harper was diagnosed with right lower quadrant abdominal pain, renal infarction, splenic infarct, and atherosclerosis of the aorta and was admitted to St. Louis University Hospital that same date. (Tr. 248-59, 264.) Testing performed at SLU Hospital showed Harper to be at low cardiac risk, preoperatively. He was started on Coumadin and discharged on December 24 with the understanding that he would return at a later date for surgery. (Tr. 265-67.)

Harper visited Dr. Stachecki on December 30 for follow up, who noted that Harper would be undergoing surgery the following month. Harper currently felt well. Harper's blood pressure was under good control and Harper reported that he had significantly cut back on his cigarette smoking. (Tr. 328-31.)

Harper returned to Dr. Stachecki on January 11, 2012, who noted that surgery was scheduled later in the month. Dr. Stachecki noted that Harper had cut back on his cigarette smoking, but he had poor compliance with exercise and diet. Harper complained of mild back pain but denied any other joint pain. Dr. Stachecki prescribed medication for high cholesterol and instructed Harper to

continue with Coumadin. (Tr. 320-24.)

Harper underwent an oncology consultation on January 24 for polycythemia.[2] Dr. Caron Rigden noted Harper's medical history, including a report that he began experiencing bilateral leg pain with walking in March 2011. Dr. Rigden noted Harper's diagnosis from December 2011 with recommended surgery, but Harper reported being uninsured and unable to make the required up-front payment for surgery. He also reported that Dr. Stachecki was currently looking for another surgical provider. Harper's current medications were noted to be Warfarin, Pravastatin, Pepcid, and aspirin. Harper reported being a heavy smoker in the past – up to two-and-a-half packs per day – but that he was now down to less than a pack a day. Harper reported having no musculoskeletal pain, joint swelling, or muscle aches; and he reported having no anxiety, depression, or sleep disturbances. Upon review of laboratory results and imaging studies, Dr. Rigden opined that Harper's polycythemia may be secondary to tobacco use, and she encouraged Harper to quit smoking. Dr. Rigden ordered more testing and instructed Harper to return in a few weeks for reassessment. (Tr. 383-84.)

Harper went to the emergency room at St. Peter's Hospital on January 28 with complaints of sudden onset of hematuria. Physical examination showed

---

[2] Polycythemia is a bone marrow disease that leads to an abnormal increase in the number of blood cells. Polycythemia vera, *MedlinePlus*, https://medlineplus.gov/ency/article/000589.htm (last visited Feb. 1, 2017).

tenderness about the abdomen on the right but was otherwise unremarkable. Harper had no musculoskeletal tenderness, and range of motion was normal. He was discharged that same date in good condition with instruction to follow up with Dr. Stachecki to check Coumadin levels. (Tr. 352-58.) Later follow up showed Harper's hematuria to have resolved with a reduction in Coumadin. (Tr. 395-99.)

Harper returned to Dr. Rigden on February 7 and reported that he was doing well and that SLU Hospital was going to accommodate him for surgery. He had no pain. He reported having some occasional pruritic symptoms but no shortness of breath or chest pain. It was noted that he continued to smoke. Dr. Rigden reviewed Harper's recent lab tests and recommended a phlebotomy, with the first to be done that day with possible repeat procedures every other week. (Tr. 363.)

An abdominal CT scan dated February 15 showed extensive atherosclerosis of the abdominal aorta and common iliac arteries with possible left common iliac stenosis. (Tr. 392-93.) Harper visited Dr. Stachecki the following day, who advised him to discontinue Coumadin five days before his upcoming vascular surgery. Although he noted that Harper smoked less, Dr. Stachecki emphasized the importance of smoking cessation and cautioned Harper that treatment would be less beneficial if he continued to smoke. (Tr. 407-09.)

On April 9, Harper underwent aortobifemoral bypass at SLU Hospital. (Tr. 454-56.) During the course of his recovery, he developed acute pancreatitis for

which he received additional treatment. He was discharged from the hospital on April 27 with instructions to lift no more than five pounds and to engage in no strenuous activities. His discharge medications included Coumadin, Protonix, Lopressor, and Percocet for pain. (Tr. 452.)

Harper visited Dr. Emad Zakhary on May 8 for follow up of his aortal bypass surgery. Harper's posterior tibial pulses were 3+ bilaterally, and Dr. Zakhary noted Harper to be doing well. Dr. Zakhary prescribed Percocet and instructed Harper not to lift. (Tr. 490.) Harper was to follow up with Dr. Zakhary in one month, but the record does not contain any notation of a follow up visit.

Harper visited Dr. Stachecki on September 17, 2012, for follow up of hypertension, polycythemia, back pain, and anemia. Dr. Stachecki noted Harper's hypertension to be adequately controlled with medication, but that he nevertheless experienced headaches, fatigue, and transient weakness associated with the condition. Harper also reported having abdominal pain and jabbing pain, which Dr. Stachecki thought could be musculoskeletal in nature. Dr. Stachecki noted Harper's polycythemia to be under poor control, but that he still smoked some. Lab tests showed Harper to no longer be anemic. Harper's mood and affect were appropriate. Dr. Stachecki stated that Harper had been "disabled" for about ten months. He reported Harper to be recovering slowly from his April surgery and continued to have back, hip, and leg discomfort. Dr. Stachecki opined that Harper

could not currently work because of weakness and deconditioning, and he recommended that Harper continue with daily efforts to regularly exercise, avoid smoking, and work toward rehabilitation efforts. Dr. Stachecki expressed uncertainty as to whether Harper could do any meaningful work but was hopeful that this status would change over the next six to twelve months. (Tr. 517-24.)

On December 19, Dr. Stachecki noted Harper's recovery from surgery to continue to be slow. Harper denied any back or joint pain, headaches, depression, or fatigue. He continued to smoke "off and on." Dr. Stachecki continued Harper on his medications: aspirin, Metoprolol, Pravachol, and Warfarin. (Tr. 511-16.)

Harper visited Dr. Stachecki on May 10, 2013, and reported bruising associated with generalized weakness and his hypercoagulable state. Harper also reported having hemorrhoids, back and joint pain, and joint swelling. It was noted that Harper smoked on and off but was no longer a daily smoker. His hypertension was under poor control. Dr. Stachecki adjusted Harper's Coumadin, but no other change was made to Harper's treatment regimen. (Tr. 503-07.)

At his counsel's request, Harper visited David A. Lipsitz, Ph.D., on October 31, 2013, for psychological consultation and intellectual evaluation. Dr. Lipsitz observed Harper to have a good attitude, to be cooperative, and to have no difficulty with posture or gait. Harper reported having physical difficulties since his bypass surgery in that he continues to have pain and he hurts when he walks,

which prevents him from doing anything physical. Harper reported his mood to be "up and down" and that he gets grouchy because he does not feel well. Harper reported having diminished energy. He denied any suicidal ideation and denied any anxiety. Harper reported having friends but that he mostly stays home and watches television. Mental status examination showed Harper to be oriented to time, place, and person. There was no evidence of any active psychotic functioning. His affect was bright, but his mood was depressed. His thought processes were noted to be primarily preoccupied with his physical problems and his inability to function as he once could. (Tr. 564-67.) Performance on the Wechsler Adult Intelligence Scale showed Harper's intellectual functioning to be at the low average range. In subset testing, Harper's knowledge of arithmetic was within normal limits. (Tr. 566.) Dr. Lipsitz reported most subset scores to reflect below average functioning, noting specifically:

> [He] tends to take a trial and error rather than systematic approach to problem solving and frequently will make careless and impulsive mistakes. He is unable to adequately assimilate information from his environment, his short-term memory is somewhat deficient, and he is having difficulty concentrating on a task at hand in order to put forth a good mental effort. His vocabulary is below normal limits, he is having difficulty handling a complex matrix reasoning sequencing type task. He is unable to learn a novel task at an adequate pace with poor eye-hand coordination and he is unable to recognize likenesses among symbols in the visual realm. His general range of knowledge is narrow.

(*Id.*) Dr. Lipsitz diagnosed Harper with adjustment disorder secondary to physical

illness. Attention deficit hyperactivity disorder was to be ruled out. Dr. Lipsitz assigned a Global Assessment of Functioning score of 50. Dr. Lipsitz concluded that Harper needed ongoing psychiatric treatment with a combination of medication and individual psychotherapy. He felt this treatment could alleviate Harper's mood disturbance such that he could adjust to his environment with his given physical limitations. (Tr. 567.)

Harper returned to Dr. Stachecki on January 16, 2014, for follow up of anemia, which Dr. Stachecki noted to be stable. Dr. Stachecki noted that Harper's history of polycythemia and hypercoagulable state placed him at risk for deep vein thrombosis. Dr. Stachecki also noted that Harper had been on chronic Coumadin therapy since his bypass surgery and had been stable and asymptomatic. Harper denied having any pain, and his hypertension was stable. He smoked daily. His medications continued to be aspirin, Metoprolol, Pravachol, and Warfarin. Dr. Stachecki noted that Harper was functioning well, and he discussed the importance of staying active. Harper had been off of his anticoagulant for a week because of upcoming dental surgery, so Dr. Stachecki determined to check his INR to bring his Coumadin back to a therapeutic level. (Tr. 551-53.)

C.    Medical Expert

On May 19, 2014, Dr. Alan J. Coleman answered medical interrogatories that were put to him by the ALJ. Upon review of the medical evidence of record,

Dr. Coleman opined that Harper's complaints of poor energy, chronic weakness, headaches, and diffuse backaches were subjective in nature, given that the evidence showed surgery to have restored normal circulation, that there was no medical evidence that his circulation had worsened since surgery, and that he had not described any symptoms of circulatory impairment. Dr. Coleman opined that Harper could engage in at least a light level of physical activity. (Tr. 577.)

In a Medical Source Statement (MSS) of Ability to Do Work-Related Activities, Dr. Coleman opined that Harper could occasionally lift and carry up to fifty pounds, frequently lift and carry up to twenty pounds, and continuously lift and carry up to ten pounds. He further opined that Harper could sit, stand, or walk for two hours at a time and could sit, stand, or walk for a total of six hours each in an eight-hour workday. He opined that Harper could frequently use both hands and both feet and could frequently engage in all postural activities, including stooping, kneeling, and crawling. Dr. Coleman further opined that Harper could tolerate frequent exposure to numerous environmental conditions, including unprotected heights, pulmonary irritants, and vibrations. Finally, Dr. Coleman opined that Harper could engage in various activities of daily living, including shopping, travelling without assistance, climbing steps, preparing meals, and personal care. (Tr. 568-73.)

D.     Vocational Expert

On July 2, 2014, Denise Weaver, a vocational expert, answered vocational interrogatories that were put to her by the ALJ. Ms. Weaver was asked to assume a person of Harper's age, education, and work experience and to assume further that he could perform light work, except that he

> is able to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 6 hours of an 8-hour workday, sit for about 6 hours of an 8-hour workday; occasionally climb ramps and stairs (but not ladders, ropes, or scaffolds), occasionally balance, stoop, kneel, crouch, and/or crawl; frequently reach, handle, finger, and feel; must avoid hazards such as dangerous machinery and unprotected heights; and he is able to perform simple and routine tasks throughout the workday.

(Tr. 221.) Ms. Weaver opined that such a person could not perform Harper's past relevant work as a janitor, maintenance mechanic, plumber apprentice, forging press operator, cleaner, construction worker, or industrial maintenance repair helper because of the medium to heavy level of exertion required. (*Id.*) Ms. Weaver stated, however, that such a person could perform unskilled light work as a garment sorter, of which 27,500 such jobs existed nationally and 715 in the State of Missouri; as an apparel stock checker, of which 44,900 such jobs existed nationally and 800 in the State of Missouri; and as a cashier II, of which 950,000 such jobs existed nationally and 10,000 in the State of Missouri. (Tr. 222.)

### III.  The ALJ's Decision

The ALJ found Harper to meet the insured status requirements of the Social Security Act through December 31, 2014. He further found Harper not to have

engaged in substantial gainful activity since December 19, 2011, the alleged onset date of disability. The ALJ found Harper's disease of the aorta, peripheral vascular disease, and adjustment disorder to be severe impairments but not to meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14-17.)

The ALJ then assessed Harper's RFC and determined it to be that as he posed to the vocational expert (*see* Sec. II.D, above), which precluded the performance of Harper's past relevant work. Considering Harper's RFC, age, education, and work experience, the ALJ determined vocational expert opinion to support a finding that Harper could perform other work as it exists in significant numbers in the national economy, and specifically as a garment sorter, apparel stock checker, and cashier II. The ALJ thus found Harper not to be under a disability at any time from December 19, 2011, through the date of the decision. (Tr. 17-23.)

## IV. Discussion

To be eligible for DIB under the Social Security Act, Harper must prove that he is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the

Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

I must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). Determining whether there is substantial evidence requires scrutinizing analysis. *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, I must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).  I must consider evidence which supports the Commissioner's decision as well as any evidence which fairly detracts from the decision.  *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).  If, after reviewing the entire record, it is possible to draw two inconsistent positions and the Commissioner has adopted one of those positions, I must affirm the Commissioner's decision.  *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012). I may not reverse the Commissioner's decision merely because substantial evidence could also support a contrary outcome.  *McNamara*, 590 F.3d at 610.

Harper challenges the ALJ's credibility determination and the hypothetical question posed to the vocational expert.  For the following reasons, the ALJ did not err.

A.    Credibility Determination

Harper contends that the ALJ failed to consider all of the required factors in determining his complaints not to be credible.  Harper specifically argues that his well-documented medical treatment leading up to his surgery shows his claimed limitations to be credible.

When evaluating  a claimant's credibility, the ALJ must consider all

evidence relating to the claimant's complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. *Halverson v. Astrue,* 600 F.3d 922, 931 (8th Cir. 2010); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). The Regulations require the ALJ to also consider treatment, other than medication, received for relief of pain or other symptoms; and other measures used to relieve pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(v), (vi). While an ALJ need not explicitly discuss each credibility factor in his decision, he nevertheless must acknowledge and consider them before discounting a claimant's subjective complaints. *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010). Where an ALJ considers the credibility factors and explicitly discredits a claimant's complaints for good reason, I should defer to that decision. *Halverson,* 600 F.3d at 932. The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. *Pearsall*, 274 F.3d at 1218.

Discussing the relevant factors here, the ALJ set out numerous inconsistencies in the record from which he determined that Harper's subjective complaints of disabling symptoms were not entirely credible.

First, contrary to Harper's assertion, the ALJ thoroughly discussed the

medical treatment Harper received leading up to his surgery (Tr. 18-19) and found

it to show that Harper's "serious medical condition" "credibly stopped him from

working[.]" (Tr. 20.) The ALJ found, however, that the evidence did not support

Harper's claims that his work-precluding limitations lasted continuously for at

least twelve months. Substantial evidence supports this finding. The ALJ

specifically noted that even before his surgery, Harper reported to his medical

providers that he was feeling better and was pain free, and his treating physician

observed him to be asymptomatic. The ALJ further noted that in May 2012, four

weeks after surgery and six months after his alleged onset date, Harper's surgeon

noted him to be doing well and that normal blood flow had been restored with

good circulation. Although he reported headaches, fatigue, weakness, and pain in

September 2012, these symptoms had resolved by December 2012. He

complained to his treating physician of weakness and joint pain in May 2013, but

no pain medication or other change to his treatment regimen was recommended or

required; and, seven months later, this physician considered Harper's condition to

be stable, noting Harper to be asymptomatic, pain free, and functioning well.

Where an impairment can be controlled by treatment, it cannot be considered

disabling. *Wildman*, 596 F.3d at 965; *see also Rhodes v. Apfel*, 40 F. Supp. 2d

1108, 1122 (E.D. Mo. 1999) (ALJ did not err in discrediting subjective complaints

where evidence showed that symptoms were relieved through appropriate

treatment).

The ALJ further noted the record to show that Harper was not always compliant with his treatment recommendations, noting specifically his poor compliance with diet and exercise and his continued smoking.  *See Wildman*, 596 F.3d at 968 (adverse credibility determination justified on ALJ's finding that claimant failed to comply with prescribed diet); *Meeks v. Apfel*, 993 F. Supp. 1265, 1276 (W.D. Mo. 1997) (adverse credibility determination justified on ALJ's finding that claimant ignored directions to lose weight, stop smoking, and begin exercise program).

The ALJ also noted Harper's daily activities to be inconsistent with his complaints of disabling symptoms in that he was able to live independently in a private setting, perform his own personal care, care for a pet, prepare meals, go shopping, take care of household chores, drive, and visit with family and friends. *See, e.g., Wagner v. Astrue*, 499 F.3d 842, 852 (8th Cir. 2007) ("extensive daily activities, such as fixing meals, doing housework, shopping for groceries, and visiting friends" inconsistent with complaints of disabling symptoms); *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (performing household chores with help, preparing meals, visiting friends, shopping, and running errands inconsistent with complaints of disabling symptoms).

An ALJ must assess a claimant's credibility based upon a review of the

record a whole.  Where this review shows the claimant not to be as limited as his testimony would suggest, the ALJ does not err in discrediting the testimony.  *See Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010).  My review of the ALJ's decision here shows that he considered the entirety of the record, including testimony and reports obtained from Harper and third parties, and identified numerous inconsistencies that detracted from his credibility.  Because the ALJ's determination not to entirely credit Harper's subjective complaints is supported by good reasons and substantial evidence, I will defer to this determination.  *See Renstrom v. Astrue,* 680 F.3d 1057, 1065-67 (8th Cir. 2012).

B.     Hypothetical Posed to Vocational Expert

Harper claims that the hypothetical to the vocational expert was incomplete because it failed to include the mental and cognitive limitations identified by Dr. Lipsitz in his psychological/intellectual evaluation, and that the ALJ therefore erred when he relied on the expert's response to this incomplete hypothetical to find him not disabled.

"The Commissioner may rely on a vocational expert's response to a properly formulated hypothetical question to show that jobs that a person with the claimant's RFC can perform exist in significant numbers."  *Guilliams v. Barnhart,* 393 F.3d 798, 804 (8th Cir. 2005).  A vocational expert's opinion that is based on a hypothetical question that does not encompass all relevant effects of a claimant's

impairments cannot constitute substantial evidence to support an ALJ's decision. *Renstrom,* 680 F.3d at 1067; *Jones*, 619 F.3d at 972. While the hypothetical question need not contain a description of the claimant's impairments in diagnostic terms, it must "capture the concrete consequences" of the impairments. *Lacroix v. Barnhart,* 465 F.3d 881, 889 (8th Cir. 2006); *see also Renstrom*, 680 F.3d at 1067. However, it need only include those impairments and limitations properly found by the ALJ to be supported by substantial evidence on the record as a whole. *Perkins v. Astrue*, 648 F.3d 892, 901-02 (8th Cir. 2011); *Buckner v. Astrue*, 646 F.3d 549, 560-61 (8th Cir. 2011).

Here, the only mental/cognitive RFC limitation included in the hypothetical posed to the vocational expert was that Harper was limited to the performance of simple and routine tasks. In his written decision, the ALJ stated that this limitation accounted for Harper's deficits in concentration, attention, range of knowledge, and trial and error approaches to problem solving, as reported by Dr. Lipsitz. (*See* Tr. 20.) Harper claims that the broad limitation to simple and routine tasks does not capture the effect of these specific limitations as found by Dr. Lipsitz, and that the ALJ erred by not including them in the hypothetical.

The Eighth Circuit has found that a limitation to simple work adequately accounts for a finding of borderline intellectual functioning and that a limitation to simple, repetitive, and routine tasks adequately captures deficiencies in

concentration, persistence, or pace. *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001). *See also Jeffries v. Colvin*, No. 4:14CV1780 RLW, 2016 WL 1240104, at *11 (E.D. Mo. Mar. 24, 2016) (hypothetical limiting claimant to simple instructions and non-detailed tasks adequately accounted for credited medical opinion regarding moderate deficits in concentration, persistence, or pace). While some evidence suggests that Harper may have some limited intellectual functioning, there is not substantial evidence showing him to be more limited in intellectual functioning or in concentration, persistence, or pace than beyond what the ALJ included in his RFC determination and in the hypothetical posed to the vocational expert. *See Faint v. Colvin*, 26 F. Supp. 3d 896, 912 (E.D. Mo. 2014). Regardless, the mere fact that some evidence may support a conclusion opposite to that reached by the Commissioner does not allow me to reverse the decision of the ALJ, given that substantial evidence supports the decision. *Johnson v. Colvin*, 788 F.3d 870, 873 (8th Cir. 2015); *McNamara*, 590 F.3d at 610.

The ALJ did not err, therefore, in his hypothetical question posed to the vocational expert or in relying on the expert's opinion to find Harper not disabled.

## V.  Conclusion

For all of the foregoing reasons, the ALJ's determination that Harper is not disabled is supported by substantial evidence on the record as a whole, and Harper's claims of error are denied.

Accordingly,

**IT IS HEREBY ORDERED** that that the decision of the Commissioner is affirmed, and Robert Harper's complaint is dismissed with prejudice.

A separate Judgment is entered herewith.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of February , 2017.